UNITED STATES of America,
Plaintiff,

v.

The WASHINGTON MINT, LLC.; Suvon Limited Partnership, Novus Marketing, Inc.; Thomas Brokl; Henry Cousineau, III; Scott Jagodzinski; and Damian Topousis, Defendants.

Civil No. 99–1768(JRT–FLN).

United States District Court,
D. Minnesota.

Sept. 18, 2000.

Robyn A Millenacker, Anthony Wayne Brown, U.S. Attorney, Mpls, MN, Vito J DePietro, Thomas J Byrnes, U.S. Dept of Justice, Washington, DC, Susan L Christenberry, U.S. Dept of Justice, Civil Division, Washington, DC, for plaintiff.

Casey A. Kniser, Fafinski Mark & Johnson, Eden Prairie, MN, Marion Edwyn Harrison, Harrison Law Office, Falls Church, VA, for defendants.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

Plaintiff, the United States of America (the "government"), brings this action against defendants for copyright infringement, trademark infringement, trademark dilution, and false advertising.[1] The government's copyright claims arise from defendants' alleged production of, or partic-

---

**1.** The government asserted a fifth claim for common law trademark infringement based on defendants' alleged production of replica coins using names confusingly similar to the United States Mint's American Eagle gold, silver and platinum plated proof coins. The government has voluntarily withdrawn this claim and it is no longer before the Court.

ipation in the production of, a gold coin replica of the recently issued United States dollar coin featuring an image of Sacagawea (the "Sacagawea dollar"). The government's trademark claims arise from the use of the "Washington Mint" name by defendant Washington Mint, LLC (the "Washington Mint") to designate its products. The government asserts that this name is confusingly similar to its registered trademark, the "United States Mint." The government further claims that defendants engaged in false advertising through a variety of misrepresentations made by the Washington Mint in communications to the public about its products. This matter is before the Court on the government's motion for a preliminary injunction prohibiting defendants from continuing to manufacture and sell replicas of the Sacagawea dollar, and from using the "Washington Mint" trade name, the registered trademark "The Washington Mint LLC," or the Internet domain name "washingtonmint.com." This matter is also before the Court on a motion for summary judgment brought by defendants Suvon Limited Partnership ("Suvon"), Novus Marketing, Inc. ("Novus"), Henry Cousineau III ("Cousineau"), Scott Jagodzinski ("Jagodzinski"), and Damian Topousis ("Topousis") (collectively, the "Suvon defendants"),[2] and on a separate motion for partial summary judgment brought by defendants Thomas R. Brokl ("Brokl") and the Washington Mint (collectively, the "Washington Mint defendants").

## BACKGROUND

### The Relationships Between the Defendants

Suvon owns or controls 100 percent of the stock in the Washington Mint, while Novus acts as a marketing and advertising agency for the Washington Mint. Novus owns the Internet domain name against which the government seeks an injunction, "washingtonmint.com." Novus

contends, however, that the Washington Mint leases the web site from it and that only the Washington Mint has control over its content. Novus is also more directly connected with the Washington Mint through its employees, as Novus purports to "lease" a number of its employees to the Washington Mint to provide services for that company. Importantly, these employees include not only the Washington Mint's ordinary staff members, but also defendant Brokl, who is the president and CEO of the Washington Mint. Thus, the managerial employee who apparently exercises the most control over the Washington Mint's activities is actually employed by Novus and then contracted out to perform those duties.

Cousineau is both a limited partner in Suvon and the sole owner of Novus. He is also on the board of directors of the Washington Mint. Jagodzinski is a limited partner in Suvon and is a co-CEO, co-president, CFO, COO, treasurer and secretary of Novus. He is also on the board of directors of the Washington Mint and acts as its treasurer and secretary. Topousis is a limited partner in Suvon and is a co-CEO and co-president of Novus. He is also on the board of directors of the Washington Mint and acts as its chief manager.

### Background Pertaining to Alleged Copyright Violations

The United States Mint, an agency of the government, employs a number of artisans and engravers who ordinarily are responsible for designing the figures depicted on coins issued as legal tender. In 1997, however, the government began the process of designing a new one-dollar coin to replace the Susan B. Anthony dollar. Rather than delegating the design process to artists employed by the United States Mint, the government invited both United States Mint employees and a select group of private artists to submit designs for the

---

**2.** Although these defendants originally filed their motion as a motion to dismiss pursuant to Rule 12(b)(6), they concede that because the parties have submitted materials outside

the pleadings for the Court's consideration, their motion should be construed as one for summary judgment.

obverse and reverse sides of the new coin. Private artists received $1,000 each in exchange for their participation. The government required each private artist to assign to it all rights in the designs and materials submitted in order to participate.

The United States Mint formed a committee of persons to solicit input from United States Mint employees, members of Congress, coin collectors, artists and other members of the community, and to choose from the designs submitted based on the input received. The selection process was anonymous, such that committee members were unaware of the identity of the artist who designed a given submission, and did not know whether the artist was a government employee or a private artist until after the selections were made.

The committee ultimately selected a design of Sacagawea submitted by Glenna Goodacre ("Goodacre"), on October 21, 1998, for the obverse side of the new coin. Upon selecting Goodacre's design, the government became obligated to pay her an additional $5,000. Goodacre is not a government employee. The committee selected a design submitted by Thomas Rogers ("Rogers"), a United States Mint employee, for the reverse side of the coin.

On May 4, 1999, Hillary Rodham Clinton unveiled the design of the new dollar coin at a public White House ceremony. At the same time, the United States Mint made photographs of the new coin available to the public on its website.

In August 1999, general counsel for the United States Mint became aware that the Washington Mint was advertising, manufacturing and selling oversized, 3½-inch replicas of the Sacagawea dollar. Defendants freely admit that the Washington Mint created and produced its replica from public information released by the government pertaining to the new Sacagawea dollar, calling their product an "exquisite adaptation of the new United States Dollar coin." The government has submitted photographs and examples of the Sacagawea dollar and the replica of it produced by the Washington Mint. An inspection of these exhibits reveals that the Washington Mint's product could not have been an original design, but rather, is a direct and intentional copy of the Sacagawea dollar. Moreover, the Washington Mint admitted in its answers to interrogatories that in April or May 1999 it commissioned another company to design "a near replica or adaptation of the proposed new [Sacagawea dollar] design which the United States Mint publicly had posted on its website." Thus, it is indisputable that the Washington Mint intentionally copied the design on the Sacagawea dollar coin based on government publicity issued prior to the date that it released the coin into circulation.

Soon after learning about the Washington Mint's replica, the government registered two copyrights in connection with Goodacre's designs. The first registration, Number VA–966–985, documents the government's copyright in the original three-dimensional plaster sculpture of Sacagawea submitted by Goodacre. The second registration, Number VA–966–986, documents the government's copyright in a second plaster sculpture constituting a slightly modified version of the original design. The government has submitted evidence indicating that these minor modifications were necessary in order to preserve the design during mass production, but that no substantial changes to the original design were made. Goodacre participated in the modification process, but did so with assistance from the United States Mint and its employees. The second copyrighted design is registered as a derivative work of the first, and is the design from which the Sacagawea dollar ultimately was produced. Both registrations state that the government acquired its rights in the designs by written contract or assignment from Goodacre.

On August 11, 1999, Kenneth Gubin, former Chief Counsel for the United States Mint, sent a letter to Brokl and the Washington Mint informing them that the government owned a copyright in the obverse design of the Sacagawea dollar. The let-

ter further requested that the Washington Mint cease and desist advertising and distributing its replica of the coin. The Washington Mint refused to comply with the government's request, and this lawsuit followed.

### Background Pertaining to Alleged Trademark Violations

The government obtained a registered trademark in the name "United States Mint" on March 6, 1990, under Patent and Trademark Office ("PTO") classification 14 pertaining to numismatic coins and medals. The government further contends that it has a common law claim to the trademark "United States Mint" based on usage since the 1800s. The Washington Mint registered its trademark, "The Washington Mint, LLC," in 1996.

The government asserts that the name "Washington Mint," creates confusion in the marketplace as to the origin of the Washington Mint's products, and furthermore, that its use of that name has diluted the government's trademark. It offers evidence in the form of letters and affidavits showing that a number of consumers have purchased products or inquired about purchasing products from the Washington Mint in the belief that they were purchasing coins from the United States Mint. Several of these consumers have sought refunds from the United States Mint for Washington Mint products, complaining about the poor quality of the items that they purchased. Although the Washington Mint includes a disclaimer in most of its advertisements stating that it is not affiliated with the United States government, this disclaimer is inconspicuously printed in small type at the bottom of the advertisements. It is apparent from the letters and affidavits submitted that many consumers have been confused notwithstanding the presence of the disclaimers.

The government contends that use of the term "Washington" specifically contributes to consumer confusion. It points out that the term "Washington" has no real geographical connection to the Washington Mint, since it is located in the State of Minnesota. Rather, the government contends that the Washington Mint uses this term with the knowledge and intent that many consumers will be mislead into confusing its business with the United States Mint's headquarters in Washington, D.C.

The government asserts that consumer confusion is furthered by the fact that the Washington Mint and the United States Mint are engaged in producing and selling coin sets and other items that are substantially similar. These items include replicas produced by the Washington Mint that are nearly identical to genuine United States coins. In response, the Washington Mint contends that the similarity between the parties' products is of no consequence, since it occupies a different market than that occupied by the United States Mint. It specifically asserts that while the United States Mint markets to numismatists, or serious coin collectors, its target audience consists merely of consumers seeking to acquire a few collectible items. Nevertheless, there is no evidence to support the assertion that the United States markets its products only to numismatists. Indeed, several of the letters from confused consumers submitted by the government are from individuals who explicitly state that they are not coin collectors, but that they purchased coins from the Washington Mint in the belief that they were minted by the government.

Moreover, the government has submitted evidence indicating that the quality of the coins produced by the Washington Mint is inferior to that of the coins minted by the government. This evidence includes an affidavit from a quality assurance specialist for the United States Mint who states in connection with the Sacagawea dollar that the Washington Mint's replica contains lower relief height such that much of the detail of the design is obliterated. The government argues that by releasing inferior products into the marketplace under a name that is confusingly similar to that of the United States

Mint, the Washington Mint has diluted the government's trademark and damaged the reputation that it holds in the quality of its products.

**Background Pertaining to False Advertising Claims**

The government's false advertising claims arise not only from the use of the "Washington Mint" name, but also from other representations contained in the Washington Mint's advertisements. These include use of the words "United States of America" on coin replicas produced by the Washington Mint, when such replicas are not products of the United States government, and use of the term "dollar" in advertisements for replicas that are not legal tender.

The government also notes that the genuine Sacagawea dollar is marked with the artist's initials, "gg." The Washington Mint removed these initials in creating its replica of the coin, inserting its own foundry mark, "WM" instead. The government argues that in doing so the Washington Mint seeks to confuse consumers about the artistic origins of the design.

Moreover, the government asserts that the Washington Mint is engaged in the process of colorizing genuine United States "Silver Eagle Proof" coins, as well as producing and selling colorized, non-genuine replicas of the same coins. The government asserts that by selling both kinds of colorized coins, defendants are creating confusion among consumers as to the origins of the coins.

Finally, the government points out that both the United States Mint and the Washington Mint offer programs marketing the new United States quarters with designs commemorating each of the fifty states. Both the United States Mint and the Washington Mint offer to send customers original mint-condition quarters from each state housed in covers containing postmarks from each state's capital. The Washington Mint nevertheless advertises that its "postage cancellation program is facilitated by an exclusive arrangement with the post office." The government contends that since it has a similar arrangement with the Postal Service, this advertisement is false and misleading.

## ANALYSIS

### I. Preliminary Injunction Motion

The government seeks a preliminary injunction prohibiting the Washington Mint and its affiliates from manufacturing, selling, advertising or distributing any work that is copied or derived from any coin design for which the United States Mint holds a copyright, including the design on the obverse side of the Sacagawea dollar. The government further seeks an injunction prohibiting the Washington Mint from using the trade name "The Washington Mint," the Internet domain name "washingtonmint.com," or the registered trademark "The Washington Mint, LLC," in connection with the sale of genuine products manufactured by the United States Mint or products constituting replicas of United States Mint products.[3]

Courts analyze four factors in evaluating a motion for a preliminary injunction, including: (1) the probability of success on the merits; (2) the threat of irreparable harm to the moving party in the absence of an injunction; (3) the balance between this harm and the injury that granting the injunction will inflict on the non-moving parties; and (4) the public interest. See Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 783 n. 2 (8th Cir.1995); Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). No single factor is determinative, rather, a court must balance all four of them to determine whether the equities

---

**3.** In its complaint the government seeks a much broader injunction prohibiting the Washington Mint from using the trade name, trademark and domain name at issue in any capacity whatsoever. Nevertheless, during the hearing on these motions the government expressly narrowed its claims and now seeks only to enjoin the use of these terms in connection with the sale of United States Mint products or replicas of such products.

favor court intervention to preserve the status quo pending a determination of the merits of the parties' claims. *See Hill v. Xyquad, Inc.,* 939 F.2d 627, 630 (8th Cir. 1991); *West Publishing Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986).

### A. Probability of Success on the Merits

The likelihood of success on the merits of the government's claims is central to the parties' dispute. Defendants raise a variety of challenges to the substance of plaintiff's copyright and trademark claims.

### 1. Applicability of the government works exception

In connection with the government's copyright claim defendants challenge the validity of the registered copyrights that the government seeks to assert. The Federal Copyright Act, 17 U.S.C. §§ 101–1332, protects from unauthorized reproduction any "original work of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. In this case, the government's copyrights are entitled to a presumption of validity because they are supported by certificates of registration. *See* 17 U.S.C. § 410(c). Defendants nevertheless note that under the Copyright Act, protection is not available for "any work of the United States Government." 17 U.S.C. § 105. Any work that is "prepared by an officer or employee of the United States Government as a part of that person's official duties" constitutes a "work of the United States Government." 17 U.S.C. § 101. Nevertheless, the government works exception to copyright protection contains a proviso stating that the federal government may hold copyrights in works transferred to it by assignment when such works are not prepared by government employees. *See* 17 U.S.C. § 105.

Defendants acknowledge that Goodacre is not a government employee. Nevertheless, they contend that the purported copyrights in her designs are invalid because the government commissioned them. The circumstances of this case therefore differ substantially from those in which the government simply purchases a copyright from a private citizen on a product that he or she designed with no government involvement whatsoever. Defendants assert that by commissioning a private citizen to do work that it could have accomplished otherwise with its own employees, the government is seeking to circumvent the strictures of the government works exception and to gain copyright protections that the statute would otherwise prohibit. According to defendants, recognizing the government's purported copyright in this case would render the prohibition on copyrighting government works completely nugatory.

The potential problems attendant to government commissioned works are discussed at length in the legislative history to this provision, reprinted in the historical and statutory notes to the statute as codified at 17 U.S.C.A. § 105 (1996):

> The bill deliberately avoids making any sort of outright, unqualified prohibition against copyright in works prepared under Government contract or grant. There may well be cases where it would be in the public interest to deny copyright in the writings generated by Government research contracts and the like; it can be assumed that, where a Government agency commissions a work for its own use merely as an alternative to having one of its own employees prepare the work, the right to secure a private copyright would be withheld.... Where, under particular circumstances, Congress or the agency involved finds that the need to have a work freely available outweighs the need of the private author to secure copyright, the problem can be dealt with by specific legislation, agency regulations, or contractual restrictions.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976), U.S.Code Cong. & Admin.News 1976, p. 5659. In *Schnapper v. Foley,* 667 F.2d 102, 108–09 (D.C.Cir.1981), *cited with approval in Applied Innovations, Inc. v.*

*Regents of the University of Minnesota,* 876 F.2d 626, 634 (8th Cir.1989), the District of Columbia Circuit cited this report and explicitly held that the language of the Copyright Act does not prohibit copyright protection for works commissioned by the federal government. In that case, the Judicial Conference commissioned a local television station to produce a series of films dramatizing early Supreme Court cases. *See id.* In reaching its determination, the *Schnapper* court assumed that the contract required the television station to assign its copyright to the government, and that such an assignment actually took place. *See id.* at 108. The court nevertheless upheld the copyright at issue, noting that the legislative history appears to "vest the government with some flexibility" in making arrangements with private contractors. *Id.* at 109.

■ The Court agrees with the reasoning articulated in *Schnapper.* The Congress appears to have recognized that in some instances, copyrighting government commissioned works would undermine the policies of the government works exception. Nevertheless, it deliberately chose not to incorporate language restricting such copyrights into the statute. Rather, the Congress contemplated that any problems could be addressed with specific legislation or agency regulations tailored to the facts in each circumstance. Thus, the solution appears to lie with the legislature or executive branches, but not with the judicial branch.

Defendants contend that *Schnapper* is distinguishable from the case at bar on the ground that the United States Mint had employees on staff who could have designed the Sacagawea coin, whereas the Judicial Conference does not likely employ a team of filmmakers. Thus, defendants assert that in this case the government commissioned the designs "merely as an alternative to having one of its own employees prepare the work." Defendants therefore conclude that the United States Mint commissioned the work, and required the assignments, as a subterfuge for the purpose of avoiding the statutory restrictions.

The available evidence strongly undermines such a conclusion. Documents published on the United States Mint's website in June 1998 state that the government has received complaints from coin collectors for many years about the "static" nature of the coin designs it has produced and the lack of public participation in the design process. In response to these concerns, the United States Mint engaged in a unique selection process focused on substantial public participation in the creation and selection of the new coin design. This evidence supports a reasonable inference that the government sought designs from private artists in order to cultivate public approval of the new coin.

Moreover, the manner in which the designs were selected negates any contention that the government sought to circumvent the statutory prohibition on copyrighting government works. Plaintiff concedes that the selection process was anonymous, and that works from both private artists and government employees were considered. This process resulted in the selection of both Goodacre's obverse design, and a reverse design submitted by an artisan from the United States Mint. The government's decision to consider uncopyrightable works created by United States Mint employees, and ultimately to choose one of these designs through an anonymous selection process, substantially undermines defendants' contention that the government solicited outside participation solely in order to gain copyright protection. For these reasons, the Court rejects defendants' contention that the copyrights at issue are invalid as violating the public policy underlying section 105.

**2. When the copyright arose**

■ The Washington Mint defendants contend that the government's copyright is invalid under the government works exception because Goodacre did not copyright her own designs, but rather, the

government "copyrighted" the designs after Goodacre submitted them. In asserting this argument they have confused the distinction between the point in time when copyright protection arises and the point in time when copyright registration takes place. The Copyright Act provides that protection arises from the moment when an author affixes his or her work to "any tangible medium of expression," 17 U.S.C. § 102, while registration is necessary only for the enforcement of a copyright in court in certain circumstances. *See* 17 U.S.C. § 411; *see also GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed. Cir.1996). Goodacre's protection in the copyrighted works therefore arose from the moment that she finished creating the plaster molds. She then transferred these copyrights to the government pursuant to a contract of assignment. The fact that the government later registered the copyrights that it acquired from Goodacre is thus irrelevant for purposes of this analysis.

### 3. Administrative authority

■ The Washington Mint defendants further challenge the government's ownership of the copyrights at issue on the ground that the United States Mint had no administrative authority to acquire them. They point to the authorizing statute that is applicable to the United States Department of the Treasury, of which the United States Mint is a division, 31 U.S.C. § 5111. This statute provides that the Treasury Department has the authority to "make contracts . . . to acquire articles, materials, supplies and services (including equipment, manufacturing facilities, patents, patent rights, technical knowledge, and assistance) necessary to produce . . . coins."

The Washington Mint defendants contend that because the authorizing statute contains no specific reference to acquiring copyrights, while listing other things that the Treasury Department may acquire, it has no authority to do so. They cite the well-known canon of statutory construction, *"expressio unius est exclusio alterius,"* meaning "the expression of one thing

is the exclusion of another," in support of this contention. Black's Law Dictionary 581 (6th ed.1990).

This argument is unpersuasive. The canon upon which the Washington Mint defendants rely is inapplicable when, as in this case, the specific items enumerated follow a list of more general terms and are contained within a parenthetical beginning with the word "including." This language indicates an intent not to limit the more general terms to the specific items listed, but rather, merely to provide a few examples of the kinds of "articles, materials, supplies and services" that the Treasury Department is authorized to acquire. Moreover, Goodacre's artistic expertise arguably constitutes a form of "technical knowledge" such as that specifically enumerated in the statute. For these reasons, the Court rejects defendants' contention that the acquisition of copyrights by the United States Mint constitutes an unlawful *ultra vires* activity.

### 4. Infringement

■ In order to establish copyright infringement, a claimant must demonstrate both ownership of the copyright, and "copying" by the defendant. *See Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir.1992); *Nelson v. PRN Productions, Inc.*, 873 F.2d 1141, 1142 (8th Cir.1989). The second prong may be met either by direct evidence of copying or by circumstantial evidence establishing that the defendant had access to the copyrighted work and that there is a substantial similarity between the two works at issue. *See Moore*, 972 F.2d at 941–42; *Nelson*, 873 F.2d at 1142. Defendants do not contest Goodacre's assignment of her copyrights in the plaster sculptures submitted to the government. Moreover, the Washington Mint admits that it deliberately copied the design depicted on the Sacagawea dollar.

■ The Washington Mint defendants nevertheless contend that no infringement has occurred in this case because they did

not copy the plaster sculptures that Goodacre produced, but rather, only copied the prototype of the actual Sacagawea dollar coin as advertised by the government in its May 1999 announcements. The record supports this factual assertion. The coin, as defendants point out, is itself a government work that is not subject to copyright protection. Nevertheless, the coin might properly be classified as derivative of Goodacre's original plaster design. *See* 17 U.S.C. § 101 (defining derivative works to include any work "based upon one or more preexisting works" including any other form in which a work may be recast or a modification that as a whole represents the original work). Although the government owns no copyright in the coin that the Washington Mint admittedly reproduced, it does own a copyright in that portion of the design depicted on the coin that is derived from Goodacre's original plaster sculpture. Whether the Washington Mint has violated the government's copyright therefore depends upon whether an individual who reproduces a derivative work may be liable to the owner of the copyright in the original work, to the extent that the reproduction copies substantial portions of the original work.

The Court was unable to locate any cases in the Eighth Circuit addressing this precise issue. Nevertheless, courts in other jurisdictions uniformly appear to agree that copying a derivative work may give rise to liability based upon copyright ownership in the original work from which it is derived. *See Montgomery v. Noga*, 168 F.3d 1282, 1292 (11th Cir.1999) (upholding copyright claim based on copying of unregistered, second version of software containing over seventy percent of the source code from original version in which the claimant owned a registered copyright); *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1111–1112 (1st Cir.1993) (upholding copyright claim based on reproduction of unregistered Cambodian version of film containing identical video images as those depicted in registered Chinese version for which the claimant held a copyright license, reasoning that "[a]ny ele-

ments that the author of the derivative work borrowed from the underlying work ... remain protected by the copyrights in the underlying work"); *Russell v. Price*, 612 F.2d 1123, 1128–29 (9th Cir.1979) (holding that "unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product" is prohibited "so long as the underlying work itself remains copyrighted"); *Cordon Art, B.V. v. Walker*, 1996 WL 672969, *5 (S.D.Cal.1996) (holding that "infringement of art reproductions containing substantial portions of material from the underlying original drawings ... would infringe upon the underlying copyright"); *Lamb v. Starks*, 949 F.Supp. 753, 755–56 (N.D.Cal.1996) (unauthorized copying of unregistered trailer containing scenes from registered movie violated copyright in movie). The Court finds these precedents persuasive and holds that the Washington Mint is liable for violating the government's copyright in Goodacre's original sculpture to the extent that the Sacagawea coin contains substantial portions of the design depicted in that sculpture.

Defendants have offered into evidence a photograph of Goodacre's original plaster design, which is the subject of the government's first copyright. The Court has carefully compared this photograph with a photograph of the circulating Sacagawea dollar and an actual example of the Sacagawea dollar filed with the government's motion. Noticeable differences between the two exist, including alterations in the angularity of Sacagawea's face and changes in the position of the "Liberty" and "In God We Trust" inscriptions. Despite these minor differences, however, the Court finds that they are substantially similar. Both depict Sacagawea's head in substantially the same proportions turned at precisely the same angle with the same expression on her face. In both designs she carries a baby on her back, wears identical clothing and wears her hair in exactly the same way. Thus, it cannot be disputed that the Sacagawea dollar, admit-

tedly copied by the Washington Mint, contains substantial portions of the design depicted in the original Goodacre sculpture in which the government holds a copyright by assignment. The Court further notes upon directly comparing a photograph of Goodacre's original design with photographs and an example of the Washington Mint's replica, that they are substantially similar. Thus, the Washington Mint has reproduced significant portions of the original copyrighted design by copying the dollar coin derived from it. The Court for these reasons finds that the government has produced strong evidence of infringement of the original Goodacre design.[4]

### 5. Trademark validity

Defendants also challenge the merits of the government's trademark infringement claim.[5] The government owns a registered trademark in the name, "United States Mint," which it claims it has used in commerce since 1858. The government's registration of this mark constitutes prima facie evidence of its validity. *See* 15 U.S.C. § 1057(b). Defendants nevertheless contend that United States Mint's registered trademark is invalid because the articles of legal tender that it produces are not "goods" subject to protection under the Lanham Act, 15 U.S.C. § 1114. In asserting this argument, defendants point to the classification system used by the United States Patent and Trademark Office ("PTO") pursuant to federal statute, 15 U.S.C. § 1112. Defendants observe that the United States Mint registered its trademark under classification number fourteen, which identifies non-monetary coins and medallions as within the class, but not monetary coins. They contend that this is because monetary items are not subject to trademark protection. They further argue that since none of the government's infringement allegations involve non-monetary items, its trademark is not enforceable in connection with the facts alleged.

■ The Court finds these arguments to be without merit. Defendants point to no authority for the proposition that the products manufactured by the United States Mint, including legal tender, are not "goods in commerce" that may be protected under federal trademark law. While it is true that PTO classification fourteen contains no listing for monetary coins, this fact is of no legal consequence. Pursuant to federal statute, the classification system "is for the convenience of the [PTO] administration" only, and may not be used to "limit or extend the applicant's or registrant's rights." 15 U.S.C. § 1112. Rather, "[t]he applicant may apply to register a mark for any or all of the goods or services on or in connection with which he or she is using or has a bona fide intention to use the mark in commerce." *Id.* Thus, the PTO's classification system is not determinative of whether a particular article manufactured by a registrant or applicant is subject to trademark protection. *See Jean Patou, Inc. v. Theon, Inc.,* 9 F.3d 971, 975 (Fed.Cir.1993).

■ Defendants further suggest, without documentary support, that monetary coins are never traded in commerce as are other coins such as those produced by the Washington Mint. Rather, they constitute instruments of commerce and have a fixed face value that does not vary with market fluctuations. In asserting this argument, defendants ignore evidence demonstrating that the coins produced by the United States Mint serve many different uses in the hands of consumers. Although the majority of monetary coins circulate and are traded at face value as a part of the

---

4. Having so found, the Court need not address the issues of copyright validity or infringement in connection with the government's second copyright based on a plaster sculpture modification created by Goodacre with assistance from United States Mint employees.

5. Defendants do not specifically challenge the merits of the government's trademark dilution claim except to the extent that their arguments regarding the validity of the government's trademark might apply to it.

nation's standard medium of exchange, the United States Mint also produces non-circulating proof sets; commemorative coins and medals that it markets to numismatists, investors, and other interested consumers.[6] According to the government, such coins often are traded at amounts above their face values based upon precious metal content, aesthetic features, and other factors.[7] Thus, monetary coins purchased for collection and investment purposes might properly be classified as "goods in commerce." In producing these items the United States Mint acts as a business in competition with other coin producers such as the Washington Mint, and as such, is entitled to trademark protection under federal law.[8]

## 6. Likelihood of confusion

■ The Washington Mint defendants further contend that the government has failed to demonstrate a likelihood of confusion between its marks and the trademark of the United States Mint. In evaluating whether a likelihood of confusion between two marks exists, courts weigh a variety of factors, including: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its cost and conditions of purchase. *See Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1330 (8th Cir.1985), citing

*SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980).

■ . The government has introduced compelling evidence that its mark is strong and that it has acquired a secondary meaning based upon its use in commerce since 1858 in connection with the sale of coin sets and other products. The government has also shown that its numismatic sales totaled close to $672 million and its advertising costs amounted to $26 million in 1998. The Washington Mint defendants have not addressed this evidence. The Washington Mint defendants further fail to address the government's contention that the marketing channels used by the parties, including newspapers, magazines, direct mailings and Internet sales, are identical.

Moreover, the Court finds that a similarity between the "United States Mint" and "Washington Mint" marks exists, given the likely association in consumers' minds between the name "Washington" and the government's headquarters in Washington D.C. A district court in New York discussed this precise issue at length, calling the validity of "The Washington Mint" trademark into doubt in *George Washington Mint, Inc. v. Washington Mint, Inc.,* 349 F.Supp. 255, 262 (S.D.N.Y.1972). Reflecting upon its concerns, the court stated:

> At first blush—and buyers are not likely to ruminate on their first impressions—it looks as if the goods to which such a mark is affixed came from the Government Mint in the City of Washing-

---

**6.** According to one of the declarations contained in the United States Mint's trademark prosecution file, it "has conducted ... significant sales activities to market and sell proof, uncirculated and commemorative coins, and medals." The declaration further indicates that "normal numismatic operations generate revenues of approximately $130 million annually, with special commemorative programs generating significant amounts above this."

**7.** The government has filed an example of one of these, a one ounce proof platinum bullion "American Eagle" coin, as an exhibit to its motion. Although the coin shows a face val-

ue of $100, the government claims that it is actually worth approximately $700 due to its platinum content. The Court takes judicial notice of the fact that this coin is uncirculated.

**8.** The Washington Mint defendants also challenge the validity of the government's trademark on the ground that the Treasury Department has no authority to acquire trademarks pursuant to 31 U.S.C. § 5111. This argument is similar to its challenge to the Treasury Department's authority to acquire copyrights and fails for the same reasons.

ton.... On reflection, I think the combination "The Washington Mint," is too slick to pass as a legitimate trademark. Whether intended by the defendant or not, there is reason to believe that a retail buyer would be misled into thinking that the goods were made by the Government Mint.

*Id.* The Court finds these arguments to be persuasive and holds that the marks at issue in the case at bar are confusingly similar.

Furthermore, the Washington Mint's use of the name "Washington" suggests a deliberate intent to pass off its products as those of the United States Mint. The Washington Mint has offered no evidence whatsoever of any legitimate rationale for choosing that name. It appears to have no association with Washington, D.C., the State of Washington, the surname Washington, any city, county, or street by that name, or any other place or thing by that name. Moreover, for the above reasons, its choice strongly implies a government affiliation. An intent to pass off its products as those of the United States Mint may be inferred reasonably from these facts.

Although the Washington Mint includes a disclaimer of affiliation with the government on its advertisements, this disclaimer usually is printed in small type at the bottom corner of each page where an average consumer would be unlikely to read it. Rather, the most prominent features of the advertisements include photographs of replicas of the government's coins along with words associated with legal tender such as "Dollar," "Liberty," and "The United States of America." The record reflects that several consumers have been confused about the origins of the Washington Mint's products despite the existence of the disclaimer. Thus, the disclaimer does not negate any inference that the Washington Mint chose its name with the intent to confuse consumers.

The Washington Mint nevertheless contends that confusion is unlikely because its products and those manufactured by the United States Mint are not in direct competition. This contention is without merit. The Washington Mint produces coins, commemorative items and medals that are not only similar in kind to those produced by the United States Mint, but in fact are deliberately copied, nearly identical replicas of the same items. Closer competition between products would be difficult to imagine. The Washington Mint attempts to differentiate the markets occupied by the parties by asserting that it targets only occasional retail buyers and not avid numismatists and investors. The evidence demonstrates, however, that although the United States Mint sells its commemorative and numismatic products to sophisticated collectors, it also sells them to occasional buyers. Thus, although the Untied States Mint likely occupies a broader market than the Washington Mint, significant market overlap appears to exist.

The Washington Mint defendants further contend that the government has failed to produce sufficient evidence of actual confusion. Although evidence of actual confusion constitutes "positive proof" of a likelihood of confusion, it is not essential to a finding of trademark infringement. *SquirtCo,* 628 F.2d at 1091. Moreover, the government has offered into evidence a variety of letters and affidavits demonstrating clearly that consumers have been confused by the Washington Mint's advertisements. The Washington Mint defendants challenge this evidence as *"di minimis"* on the ground that only a few of these letters have been submitted to demonstrate confusion over a period of approximately eighteen years. Nevertheless, a few examples of actual confusion are sufficient to demonstrate that the marks are confusing.[9]

---

**9.** The Court is grateful that the government chose to submit only a few such examples rather than burying it in documents evidenc-

ing every complaint that it has received as a result of the Washington Mint's marks during the last eighteen years.

For all of these reasons, the Court finds that the government has produced sufficient evidence of a likelihood of confusion between the marks at issue to support a claim of trademark infringement. Having so found, and for all of the above reasons, the Court further concludes that the government had demonstrated a strong likelihood of success at trial on the merits of both its copyright and trademark claims.

### B. Irreparable Harm to the United States Mint

■ Although there is a strong likelihood that the government will prevail on its claims at trial, the Court must also consider whether it has demonstrated a threat of irreparable harm in the absence of any injunction against defendants' activities. The Eighth Circuit has held that when copyright infringement has been demonstrated, irreparable harm to the copyright holder may be presumed if the defendant has used the copyrighted material for commercial, rather than noncommercial purposes. *See National Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726, 729 (8th Cir.1986); *West Publishing*, 799 F.2d at 1229; *see also Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir.1988). Here there is no dispute that the Washington Mint has marketed its replica of the Sacagawea dollar for commercial gain. A presumption of irreparable harm thus arises from the government's strong showing on the merits of it copyright infringement claim.

■ Moreover, evidence of irreparable harm appears to exist. The government has shown that the quality of the Washington Mint's replica is inferior to that of the genuine Sacagawea dollar. It has also demonstrated that the Washington Mint began marketing its replica of the Sacagawea dollar several months before the Treasury Department released the genuine coin into public circulation. In doing so, it distorted the artistic value of Goodacre's design before the government widely publicized it, thereby damaging the reputation of the United States Mint and po-

tentially weakening the success of the new dollar program on which the government has expended substantial resources.

■ The Eighth Circuit has similarly held that irreparable harm may be presumed from a showing of consumer confusion in trademark infringement cases. *See General Mills v. Kellogg Co.*, 824 F.2d 622, 625 (1987) (reasoning that trademarks represent "intangible assets such as reputation and good will" such that a presumption of irreparable injury arises when success in proving a likelihood of consumer confusion is probable). Thus, the government need not offer actual evidence of irreparable harm to support its motion for a preliminary injunction.

Defendants nevertheless contend that harm to the reputation of the United States Mint is irrelevant since it possesses a statutory monopoly on the production of monetary coins. Thus, whether the public approves of its work cannot affect the consumption of its products because no other producer exists, and because the face value of all coins remains the same in any event. In asserting this argument, defendants overlook evidence that the United States Mint produces coins not only for public circulation but also for collection and investment purposes. Numismatists, investors, and unsophisticated consumers are not required to purchase the United States Mint's collectible proof, uncirculated and commemorative coins and medals in order to transact their daily business. Rather, they choose to do so, at least in part, in reliance on the reputation and goodwill of the United States Mint for manufacturing quality products. Thus, the United States Mint's reputation and goodwill affect the revenues it derives from these products. For these reasons, the Court finds that the government has satisfied its burden of demonstrating a threat of irreparable harm in connection with both its copyright and trademark claims.

## C. Balance of Harms

 Defendants contend that the balance of harms greatly weighs in their favor, since the harms to reputation and goodwill that the government has identified are relatively intangible, while the Washington Mint would sustain significant, concrete pecuniary injury from the injunctions that the government seeks. Defendants contend that if the Court were to prohibit the Washington Mint from producing and selling all of its products that are related to the United States Mint, it would eliminate a substantial percentage of the Washington Mint's annual revenue and effectively put it out of business.

In making this argument defendants have built a straw man and then asked the Court to knock it down. The government does not request, and has never requested, that the Court enjoin the Washington Mint from producing or selling any United States Mint-related products. Thus, the injury that it would sustain from such an injunction is irrelevant. Instead, the government seeks only to enjoin defendants from reproducing works in which the United States Mint holds a copyright, and from using the Washington Mint trade name and trademarks at issue in connection with the sale of products that are related to the United States Mint.[10]

The potential losses to the Washington Mint from such injunctions constitute real pecuniary harms—it would be prohibited from manufacturing and selling its replicas of the Sacagawea dollar, an apparently lucrative product. Moreover, it would be forced to change the name it uses in connection with the sale of United States Mint-related products, resulting in probable advertising losses and loss of goodwill. Nevertheless, there is no evidence indicating that the injunctions actually requested by the government would harm the Washington Mint to the extent that it would be forced to go out of business.

Although the probable losses that the Washington Mint would sustain from an injunction prohibiting the production of Sacagawea dollar replicas are significant, the Washington Mint should have considered the obvious risk of such losses when it decided intentionally to copy a work that it did not author without first investigating its copyright status.[11] The Washington Mint has no legitimate interest in Goodacre's design and cannot be heard to complain about the losses it might incur if prohibited from using it.

The Court finds, however, that requiring the Washington Mint to discontinue altogether its use of the "Washington Mint" trade name, "The Washington Mint, LLC" trademark and the "washingtonmint.com" Internet domain name in connection with the sale of genuine coins, coin replicas, and other products related to the United States Mint would increase its losses unnecessarily. Instead, a disclaimer of noticeable size, style and location could eliminate consumer confusion between the trademarks at issue without requiring the Washington Mint to adopt a new public identity while this lawsuit is pending. The evidence of confusion submitted by the government demonstrates that the disclaimer currently used by the Washington Mint is clearly insufficient. Rather, a no-

---

10. As noted *supra*, this requested relief, as asserted at oral argument on the parties' motions, is narrower than that stated in the government's complaint.

11. Because the designs depicted on circulating coins historically have been part of the public domain, the Washington Mint may contend that it had no reason to believe that the government held a copyright in the Sacagawea dollar design when it began reproducing it. While this may be true, it should be noted that General Counsel for the United States Mint directly notified the Washington Mint of its copyright less than four months after it announced the Sacagawea dollar coin design. The Washington Mint has continued to produce its replicas of the coin despite this notification. Moreover, the Eighth Circuit has held that intent is not relevant to a claim of copyright infringement, and that a defendant may be liable even for "innocent" or "accidental" infringement. *See Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 829 (8th Cir. 1992).

tice of no affiliation with the United States government that is bold, in large type-face, and at the top of each advertisement or Internet web page used by the Washington Mint is necessary to prevent incidents of confusion such as those documented by the government. The Court concludes that an injunction requiring the Washington Mint to provide such a disclaimer would appropriately balance the probable harms to the parties.

### D. The Public Interest

The public interest weighs heavily in favor of granting the government's request for injunctive relief in connection with its copyright claim. Defendants contend that all coins produced by the government are within the public domain, and that free use of ideas and designs that are in the public domain is in the public interest. In so arguing they neglect to acknowledge that, unlike most designs depicted on circulating coins, Goodacre's original works have never been in the public domain. It is not in the public interest to permit infringement of the intellectual property rights that Goodacre acquired in her designs at the time that she authored them. *See E.F. Johnson Co. v. Uniden Corp. of America,* 623 F.Supp. 1485, 1491 (D.Minn.1985) (holding that, "A preliminary injunction enjoining copyright infringement serves the public interest by furthering the goals of individual effort and fair competition"). In so holding the Court recognizes that circumstances may exist in which it appears that the government has commissioned private individuals to develop works on its behalf with the intent to circumvent the prohibition on copyrights in government works. In such cases the public interest generally might disfavor the issuance of an injunction. Nevertheless, for the above reasons, the Court finds that in this case there is no evidence that the government acted with any kind of improper intent. The public interest in encouraging and protecting original works of authorship outweighs its interest in free use of government works in these circumstances.

An injunction requiring the Washington Mint to include a clear and noticeable disclaimer of no affiliation with the government in all of its advertisements and other marketing materials would also serve the public interest. The government has shown that in the absence of such a disclaimer, consumers have purchased the Washington Mint's products in the erroneous belief that they were manufactured by the government. The public interest favors injunctive relief in the trademark infringement context when confusion in the marketplace as to the origin of the defendant's products has occurred. *See Aveda Corp. v. Evita Mktg., Inc.,* 706 F.Supp. 1419, 1431–32 (D.Minn.1989). This is especially true when, as in this case, the evidence supports an inference that the defendant chose the trademark at issue with the deliberate intent to pass its products off as those manufactured by the claimant.

For these reasons, the Court concludes that in light of all the equities at this stage in the proceedings and considering the extraordinary nature of preliminary relief, intervention to preserve the status quo pending a trial on the merits of the government's claims is warranted. The Court finds that an injunction prohibiting continued infringement of the government's copyright in Goodacre's original design is appropriate. Moreover, the Court will enjoin defendants from using the trademark, trade name, and domain name at issue in the absence of a notice that disclaims affiliation with the United States government in a manner that is more bold, noticeable, and clearly stated than the disclaimer currently in use.

### II. Defendants' Motions for Summary Judgment

Also before the Court are the Washington Mint defendants' motion for partial summary judgment and the Suvon defendants' motion for summary judgment. In connection with these motions, defendants argue that the United States Mint has no

administrative authority to obtain copyright or trademark registration, that the design depicted on the Sacagawea dollar constitutes a work of the United States government that is not subject to copyright protection, and that the products of the United States Mint are not "goods in commerce" entitled to protection under the Lanham Act. The Court has rejected these arguments in considering the merits of the government's preliminary injunction motion and denies defendants' motions for summary judgment to the extent that they are predicated on the same grounds.

▮▮▮▮▮▮ Brokl further argues that the claims against him should be dismissed because the acts of the Washington Mint are not attributable to him. The Suvon defendants similarly disclaim liability for the conduct of the Washington Mint in connection with their motion for summary judgment. In order to establish liability for copyright infringement, a claimant must demonstrate that the defendant either is directly and personally involved in the infringing activity or had the right and ability to supervise that activity and a financial interest in it. *See Pinkham*, 983 F.2d at 834; *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 781 (8th Cir.1988). Courts more narrowly circumscribe the scope of liability for trademark infringement. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 439, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (distinguishing trademark law from copyright law and noting that different standards of liability apply to them). In the trademark context, courts recognize that an individual employee may be liable for infringement if he or she directly participates in the infringement, regardless of whether the infringing actions were performed in the scope of employment. *See, e.g., Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3rd Cir. 1978); *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir.1968). Nevertheless, courts do not recognize vicarious liability in the trademark context based on ability to supervise in combination with a financial interest.

*See Sony*, 464 U.S. at 439, 104 S.Ct. 774. Liability for trademark infringement by an entity or individual other than the direct infringer may arise, however, if the defendant "intentionally induces another to infringe a trademark," or if it "continues to supply a product knowing that the recipient is using the product to engage in trademark infringement." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854–55, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

▮▮▮▮ Applying these principles to the case at bar, the Court agrees that the government has not established grounds for attributing the Washington Mint's conduct to defendant Suvon. The government has not shown that Suvon had any kind of supervisory control over the Washington Mint's infringing conduct or direct participation in that conduct. Although Suvon is the controlling shareholder in the Washington Mint's stock, status as an investor, without more, is insufficient under the standards articulated in *Pinkham* and *Inwood* to impose liability for either copyright or trademark infringement. The Court similarly holds that the government has failed to produce sufficient evidence of Cousineau's involvement in the Washington Mint's activities to impose individual liability upon him. Although he has significant ownership interests in both Suvon and Novus, these interests are not alone sufficient to impose liability upon him for any of the violations alleged. Moreover, although the government has shown that Cousineau is on the Washington Mint's board of directors, it has not demonstrated that he had any direct participation in or control over its activities. The Court accordingly dismisses the government's claims against these defendants.

▮▮▮▮ The government's claims against Novus, however, are not so easily dismissed. Sufficient evidence exists to create a fact issue as to whether Novus is vicariously or contributorily liable for the Washington Mint's conduct in connection

with the government's copyright infringement claim. The evidence indicates that Novus supplies all of the Washington Mint's advertising space for the Sacagawea dollar replica, and therefore, that it has a financial interest in the promotion and sale of the infringing product. Moreover, although Novus disclaims any control over the Washington Mint's activities, this contention is not supported by the evidence. Indeed, the record reflects that Novus is the actual employer of some or all of the Washington Mint's "leased" employees, including Brokl, its CEO. Supervisory control by Novus over the activities of all of its employees, including those "leased" to the Washington Mint, may be reasonably inferred. Thus, the Court concludes that a fact issue exists as to whether Novus is vicariously liable for the Washington Mint's conduct in producing and selling its replica of the Sacagawea dollar. The Court further finds that the evidence supports an inference of contributory liability against Novus for trademark infringement. Novus supplies the Washington Mint with the advertising and the Internet domain name through which the alleged trademark infringement occurs. Furthermore, Novus's knowledge that the Washington Mint uses these marketing tools to engage in trademark infringement may be inferred from the fact that Novus employs the Washington Mint staff members who directly participate in that activity. The Suvon defendants' request that Novus be dismissed from this action is therefore denied.

The evidence also supports a finding of liability on the government's copyright infringement claims against Jagodzinski and Topousis. As co-CEOs and co-presidents of Novus, their supervisory authority over the activities of Brokl and other Washington Mint employees may be inferred. Moreover, they both have a direct financial interest in the revenues derived from the Washington Mint's infringing activities. Both are limited partners in Suvon, which owns 100% of the stock in the Washington Mint. The Court concludes, however, that the government has failed to produce sufficient evidence to support a finding of liability against these individuals under the more narrow standards applicable to trademark infringement claims. It has produced no specific evidence of any direct participation by these individuals in the alleged trademark infringement, and has not otherwise demonstrated that they are contributorily liable for trademark infringement.

Finally, the Court finds that the evidence strongly supports a finding of liability against Brokl in connection with both the copyright and trademark infringement claims. In answer to the government's interrogatories, the Washington Mint defendants admitted that all of its employees, including Brokl, were directly involved in designing and producing its replica of the Sacagawea dollar. They further conceded that Brokl gave final approval for the replica's design, and that he has direct responsibility for approving and modifying the advertisements from which the government's trademark infringement claims arise. Brokl's request to dismiss the claims against him individually must be denied in light of this evidence of his direct participation in the Washington Mint's infringing activities.

## ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The government's motion for a preliminary injunction [Docket No. 25] is **GRANTED in part.**

2. In connection with the government's copyright infringement claims, the Washington Mint, Novus, Jagodzinski, Topousis, Brokl, and any and all of their successors, employees, agents, heirs, and assigns are hereby **ENJOINED and RESTRAINED** pending a final disposition of this matter as follows:

 a. The enjoined parties shall not design, produce, advertise, market or sell any copy, replica or other reproduction

of the work of Glenna Goodacre protected by the United States Mint's assigned copyright registered as copyright number VA–966–985. This injunction explicitly includes, but is not limited to, any replica of the Sacagawea dollar coin that the Washington Mint currently produces and sells or has produced and sold in the past, and requires the enjoined defendants immediately to cease the production, marketing and sale of this product. The injunction set forth in this paragraph shall take effect immediately upon the posting of security in the amount of $10,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

3. In connection with the government's trademark infringement, trademark dilution, and false advertising claims, the Washington Mint, Novus, Brokl, and any and all of their successors, employees, agents, heirs, and assigns are hereby **ENJOINED and RESTRAINED** pending a final disposition of this matter as follows:

a. The enjoined parties are prohibited from using or contributing to the use of the "Washington Mint" trade name, the registered trademark "The Washington Mint LLC," or the Internet domain name "washingtonmint.com" in connection with the advertisement, marketing or sale of any product of the United States Mint or any replica of a United States Mint product, unless each page of the advertisement, web page, order form, or other marketing tool used also contains a noticeable, clear, and boldly written disclaimer of any association with the United States government.

b. The injunction set forth in paragraph (a) above shall not take effect immediately. The parties shall have five (5) days in which to submit proposals to the Court addressing the appropriate text, location, print size, and other characteristics of the disclaimer required by the injunction. Said submissions shall exceed no more than three (3) pages in length. As soon as possible thereafter the Court will issue a final Order for Preliminary Injunction based upon the parties' submissions. The Court's final Order will set forth specific details pertaining to the characteristics of the required disclaimer, any additional security required, and the effective date of the injunction.

4. The motion for summary judgment filed by defendants Suvon, Novus, Cousineau, Jagodzinski, and Topousis [Docket No. 33] is **GRANTED in part** and **DENIED in part**.

5. The government's claims against Suvon and Cousineau are **DISMISSED, with prejudice**.

6. The Second, Third and Fourth claims for relief against defendants Jagodzinski and Topousis, as set forth in the government's first amended complaint [Docket No. 19], are **DISMISSED, with prejudice**.

7. The motion for summary judgment filed by defendants Suvon, Novus, Cousineau, Jagodzinski, and Topousis is **DENIED** in all other respects.

8. The motion for partial summary judgment filed by defendants Brokl and the Washington Mint [Docket No. 37] is **DENIED**.